UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ROBERT A. WATERS, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:07-CV-00067-PPS-CAN |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment or Remand regarding Defendant Commissioner of Social Security Administration's final decision that Plaintiff was not eligible for Disability Insurance Benefits. Upon a close review of the record, this case is remanded.

**I. BACKGROUND**

**The Medical Evidence**

Plaintiff Robert Waters is morbidly obese; he is 5'11" and weighs 425 pounds. (R. 206-08.) With this comes a host of problems. In his quest for disability benefits, Waters complained of shortness of breath, the inability to walk far and dizziness all due to his congestive heart failure, diabetes, obesity, hypertension, high cholesterol, osteoarthritis and foot and ankle deformity. (R. 59, 64.) He became disabled in July 2002, according to his application for benefits.

Waters has been seen by a primary care physician, Dr. Verlin Houck and by a cardiologist, Dr. Raman Mitra. Dr. Houck's various progress notes revealed that Waters had

1

problems with his diabetes, weight, dizziness and lower extremities. (R. 127-45, 187-98.) For example, in June 2003, Dr. Houck noted that Waters was unable to find a job because of his inability to get around due to his excessive weight and that he was not checking his blood sugar at home. (*Id.*) In March 2004, Dr. Houck documented that Waters saw him due to pain and swelling in his legs after sitting for an extended period of time; the leg pain prevented Waters from driving to Terre Haute. (R. 128.) A year later, Dr. Houck noted that Waters had not been following a diet very well and had gained even more weight. (R. 197.) Dr. Houck also recorded a trace of pedal edema – or excessive swelling in Waters' feet. (*Id.*) Waters was on a host of drugs including Lasix, Avapro, Avandia, Lipitor, Metoprolol, Minitran, Plavix, Potassium Chloride, Tricor, Aspirin and Nitrolingual. (R. 189.) In October, 2005, Dr. Houck again noted the persistent swelling in Waters' feet in addition to his obesity, diabetes, controlled hypertension and hyperlipidemia which can lead to a hardening of the arteries. (*Id.*)

Although Waters had begun his treatment with the Midwest Medical Cardiology Group in 1998 after a heart attack, the first records from Dr. Mitra begin on August 22, 2000. (R. 173, 179.) At that time, Waters complained of fatigue; he weighed 350 pounds, did not smoke or drink alcohol and had hypertension, hypoglycemia, hyperlipidemia, a history of coronary artery disease and fatigue. (R. 173-74.) The next year, the records noted that Waters had unstable angina and that he had gained an additional forty pounds since his last visit. (R. 167-68.) Dr. Mitra first noted the edema in Waters' extremities. (*Id.*) About a year later the progress notes state that Waters "is now significantly handicapped as a result of morbid exogenous obesity." (R. 161.) The notes continued to reveal that he had some chronic lower extremity edema. (*Id.*)

In July 2004, Waters returned to Dr. Mitra for a follow up on his morbid obesity,

2

orthopnea and dyspnea on exertion with 200 feet of walking and an inability to remain sitting for more than half an hour due to pain caused by venous insufficiency. (R. 159-60.) Dr. Mitra noted continued coronary artery disease, obesity, and hypertension. (*Id*.) Waters had a severe limp and continued to have edema in the ankles and feet. (*Id.*) Dr. Mitra's general conclusion was that Waters "continued to be significantly disabled because of the combination of his coronary artery disease and obesity." (R. 159). The overall state of his health – morbid obesity, hyperlipidemia, hypertension, diabetes, and severe edema – persisted into 2006. (R. 183.)

In February 2004, Dr. Ferenczy III, responding to the SSA's request for medical advice, reviewed Waters' medical records. (R. 146-57.) From his review, he found that Waters could lift ten pounds frequently, 20 pounds occasionally, stand and sit for six hours in an eight hour day with normal breaks, but could never climb, kneel or crawl, had no visual, communicative or manipulative limitations, and should avoid all exposure to hazards and extreme heat, cold and noise. (R. 147-50.) The state physician stated that the "clmt [claimant] was credible" and that the treating sources' conclusions about the claimant's limitations or restrictions were not significantly different from his own findings. (R. 151-52.)

Waters was also examined by Dr. Michael J. Kennedy at the request of the SSA. Dr. Kennedy noted in his report on December 1, 2003, that Waters had diabetes, diabetic neuropathy, coronary artery disease, hypertension, and obesity. (R. 124.) Waters told him that he gets short of breath easily, can walk only about 200 feet or climb a half flight of stairs, and that his feet are numb all the time. (R. 120.) Dr. Kennedy recorded that his review of systems was normal except for dyspnea on exertion and chest pain and found in general that Waters had no evidence of neglected hygiene, could walk about normally, had normal results for other

3

general tests performed and could stand on either leg alone and perform a squat maneuver without difficulty. (R. 121-24.) But Dr. Kennedy did note that Waters was limited in range of motion in his knees but this was due principally to his obesity. (R. 123.) He found no issues with the ankles, but did note that there was a loss of pinprick sensation from the ankles down in both feet. (*Id.*) Based on these findings, Dr. Kennedy determined that Waters should be able to work eight hours a day doing light sedentary work, with the ability to grasp, push, pull, fine manipulating, operating foot controls, bend, squat and crawl, but should not climb and cannot tolerate extreme temperatures. (R. 124.)

### **The Hearing Testimony**

At the hearing Waters testified about his past work, medical impairments, limitations due to those impairments and the effect those impairments and limitations have had on his day to day activities and lifestyle. (R. 205-27.) At the time of the hearing, Waters was working approximately thirteen hours a week doing computer work from his home. (R. 208.) He was only working part time because he cannot sit for prolonged periods of time. (R. 209.) Waters testified that he has diabetes, congestive heart failure, hypertension, high cholesterol, osteoarthritis and high blood pressure, and these physical impairments keep him from working full-time. (R. 210-11.) These impairments affect his ability to sit because his legs go numb below the knees; the impairments also prevent him from standing for more than five to seven minutes and from walking more than two hundred feet. (*Id.*) In fact, walking is a real problem for Waters. (*Id.*) Waters testified that he had a heart attack in 1998 and received two angioplasties and had three stints placed in his heart. (R. 212-13.)

A typical day for Waters is marked by lethargy. Waters testified that he wakes his wife up for work at about 4:45 am and then goes back to sleep until about 7:00 am. (R. 214.) At that time, his six year old grandson is dropped off until the bus picks him up for school at about 8:15 am. (R. 215.) They watch TV together during this time. (*Id*.) After his grandson leaves, Waters checks his email and does some work on the computer for South Bend, if he has any, for about forty-five minutes. (*Id*.) For the remainder of the day he works on and off in between watching TV while lying on the floor or taking a nap. (R. 216 .) Waters takes a two hour nap in the morning and then has lunch at about 1:30 pm which he makes for himself; usually it is something simple like a sandwich, TV dinner or leftovers. (*Id*.) About once a week he also naps in the afternoon for two hours. (R. 226).

After his wife comes home from work Waters usually eats dinner and then watches TV until about 11:00pm. (R. 217.) Waters admitted that he can dress, groom and bathe himself but has trouble putting on his shoes. (R. 218.) He is unable to do any household chores. (*Id*.) Waters has no hobbies and cannot exercise. (R. 218-19.) On the issue of depression, Waters believed that his depression might be a symptom of his medication. (R. 219.) But the depression does not appear to be acute because Waters is not receiving any treatment for the depression. (*Id*.)

As for pain, Waters stated that he has pain in both of his knees, feet and ankles. (R. 222.) He stated that his feet are numb almost all the time and that he has trouble braking when driving or knowing how hot the water is in the shower. (*Id*.) His knees ache about four or five days a week for about half the day. (R. 223.) His ankles ache when he has to walk over 300 feet in a day. (*Id.*) To alleviate the pain, he has to lie down. (R. 224.)  Waters stated he can probably

lift no more than 20 pounds on a regular basis; and in an eight hour day he can walk for a total of only thirty minutes, stand a total of one hour and sit about four, but not continuously.  (*Id*.)

Waters' wife of thirty years, Jeannette Waters, testified at the hearing as well.  (R. 227.)  She essentially corroborated everything that Waters said.  He needs to lie down after sitting for more than half an hour; although he used to be able to take care of the yard work and help around the house, he is no longer able to do those things.   (R. 228.)  He cries because he is of no help to her.  (*Id*.)  He naps for a couple of hours in the morning and afternoon.  (*Id*.)  And if her husband is working on the computer, after about an hour, his feet swell and become discolored.  (R. 229.)

**Vocational Expert's Testimony**

Christopher Young, a vocational expert (VE), testified regarding Waters' ability to work.  (R. 229.)  He said that Waters' most recent past work as an IT manager was a skilled sedentary position.  (R. 230.)  The VE also stated that his two other previous positions as a parts supervisor and inventory control were both skilled light positions.  (*Id*.)

The ALJ asked the VE two hypothetical questions.  (R. 231.)  First, he asked the VE what positions a hypothetical individual could perform with the following characteristics:  aged 47 to 50, with a high school education, the same past work experience as Plaintiff, limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally, that could stand and walk two hours in an eight hour day, sit six hours in an eight hour day, and could never climb ropes, ladders, or scaffolds, kneel, crawl, frequently climb ramps or stairs and must avoid all hazards and concentrated exposure to extreme cold and humidity.  (*Id*.)  The VE answered that this individual could perform sit-down light work, due to the ability to occasionally lift and carry 20

pounds. (*Id.*) He suggested the positions of office helper, survey worker, and sub-assembler of electrical equipment as examples of sit-down light work, and that there are approximately 37,000 of these jobs in the region. (*Id.*) There were also about 2,800 sedentary jobs available. (*Id.*)

The ALJ asked the VE to assume that all of Plaintiff's testimony was supported and credible. (*Id.*) The VE recited Waters' testimony that he "lays down at least once a day for two hours, frequently two times a day for three hour naps, suffers from memory and also pain, which impacts his ability to concentrate. He cannot fulfill an eight hour day in any combination of standing, walking or sitting." (R. 232-33.) According to these facts, the VE testified that Plaintiff could not work a full eight hour day in any position. (R. 233.) Finally, Waters' attorney asked the VE to reflect on the same hypothetical first posed by the ALJ, but to consider if the individual was limited to sitting for half an hour due to pain and then must lie down to relieve the pain. (*Id.*) In response, the VE testified that there were no jobs that such an individual could perform. (*Id.*)

### **ALJ Findings**

After applying the five-step analysis required by the Social Security Administration for determining if an applicant is disabled, the ALJ concluded that Plaintiff was not disabled. (R. 13- 19.) The ALJ found that Waters has the residual functional capacity (RFC) to lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand/walk about 2 hours and sit about 6 hours in an 8- hour day; and frequently climb ramps and stairs, stoop, and crouch, but never climb ladders, ropes, or scaffolds, kneel, or crawl. (R. 16.) According to the ALJ Waters can occasionally balance, but he must avoid concentrated exposure to extreme cold, heat, and humidity; and he must avoid all exposure to workplace hazards. (*Id.*)

7

The ALJ thus concluded that Waters is capable of performing past relevant work as an IT manager because this work does not require the performance of work-related activities precluded by his residual functional capacity (20 CFR 404.1565). This made him not disabled under the Act.

In arriving at this conclusion the ALJ also made specific observations about the credibility of both Waters and his treating cardiologist, Dr. Raman Mitra. The ALJ did not believe Waters as to the intensity, persistence and limiting effects of his medical impairments. (R. 17.) The ALJ was even less impressed by Waters' cardiologist, Dr. Mitra:

> Dr. Mitra opined the claimant continued to be significantly disabled because of the combination of his coronary artery disease and obesity. Dr. Mitra also noted the claimant had a severe limp and he could not perform any significant activity, however, the remainder of his ten point review of systems was normal. The undersigned gives little weight to Dr. Mitra's opinion because the determination or decision of disability is an administrative finding that is expressly reserved to the Commissioner. Additionally, Dr. Mitra's opinions on the claimant's functional limitations are not consistent with the claimant's testimony, and thus, the undersigned finds that Dr. Mitra's opinion is not entirely reliable.

## II.  DISCUSSION

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that the agency findings "as to any fact, if supported by substantial evidence, shall be conclusive" and limits the scope of judicial review under section 205(g).  42 U.S.C. § 405(g). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). My review of the ALJ's findings is deferential. *Lopez ex rel. Lopez*, 336 F.3d 535, 539 (7th Cir. 2003). But a decision "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Id.*

8

In other words, there has to be a logical connection between the evidence and the ALJ's conclusion. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

There is a five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520 416.920. A finding of disability requires an affirmative answer at either step three or step five. The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner. *See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The analysis at step four involves a determination of the claimant's RFC. An RFC is an assessment of what an individual can do in a work setting (in other words, eight hours a day for five days a week) despite their limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *2. This evaluation is based on an individual's ability to meet the physical, mental, sensory and other requirements of work. § 404.1545(a)(4). This decision is not a medical decision; it is a legal one. *See* § 404.1527(e). "[T]he RFC determination forms the crux of most of the ALJ's decisions regarding a claimant's ability to perform past relevant work." *Prince v. Sullivan*, 933 F.2d 598, 602-03 (7th Cir. 1991). It was at this step that the ALJ determined that Waters failed his burden and found him not disabled. (R. 18.)

Plaintiff argues on appeal that the ALJ did not assess his credibility in compliance with

social security rulings (SSRs), gave improper weight to the opinions of treating doctors, should not have rejected his mental impairment claim, and erred in finding that he had the ability to perform his past work due to his limitations.

**A.    The ALJ's Credibility Assessment of the Plaintiff**

The ALJ's credibility determination was explained in the following passage:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. 17.) To support this finding, the only thing that the ALJ pointed to was the claimant's testimony "that he sits for several hours a day working on his computer and watching television." (R. 18.) But even this brief reference misstates what Waters actually said which is that he can only sit for an hour or an hour and a half at a time and then he needs to lie down. (R. 215-16). And his wife corroborated this. (R. 228).

Generally speaking, an ALJ's credibility determination is given deference unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). However, reviewing courts have greater freedom to review the ALJ's decision when the "determination rests on objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

The ALJ's brief statement in this case does not pass muster. Under SSR 96-7p, which is binding on ALJs, *see Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003), the ALJ must make more than a conclusory statement along the lines of "I don't believe him." "The

10

determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p at *2.  Similarly, the ALJ must explain any inconsistencies with regard to pain complaints, daily activities and medical evidence when making a credibility determination.  *Zurawski v. Halter*, 245 F. 3d 881, 887 (7th Cir. 2001).

   The Commissioner argues that the ALJ discussed Plaintiff's daily activities and considered them in the context of the medical evidence when he concluded that Waters statements regarding his symptoms and the limiting effects of those symptoms were not "entirely credible."  This is an overstatement because the ALJ ignored several significant pieces of evidence not favorable to his conclusion.  This he cannot do.  *See Young*, 362 F.3d at 1002-03(the ALJ must confront the evidence that does not support his conclusion and explain why it is rejected).  The ALJ did not address Waters' testimony that he often takes naps after working for a short time on the computer; that he can only stand in line for about 5-7 minutes before having to sit down; that he lies on the floor when he watches TV; that he has significant pain in his feet and ankles; that he has special work accommodations; or even that the agency reviewers found him credible.  (R. 151, 211, 215-16, 222-23, 226.)

   The ALJ also found that Waters was "not entirely credible" as it relates to the "intensity" of his symptoms.  (R. 17).  This seems to be getting at the pain Waters is experiencing.  But in this regard, the ALJ did not consider the relevant factors when assessing Waters' symptoms and pain.  In addition to the objective medical evidence, the ALJ should consider 1) the claimant's daily activities; 2) the location, duration, frequency of pain or other symptoms; 3) the factors that

11

precipitate or aggravate the symptoms; 4) medication to alleviate pain; 5) the treatment the individual receives; 6) any measures used to alleviate pain; and 7) any other factors. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p.  Here, the ALJ considered Plaintiff's daily activities only in a superficial and cursory way and he scarcely discussed Waters' pain at all.  Nor did he touch on, in a meaningful way, the other factors set out in the regulations.

  The Commissioner claims that the ALJ's credibility determination should be sustained because it was supported by the evidence from the consultative examiner. (Def.'s Mem. at 5.) This is problematic because treating physicians are supposed to be given controlling weight according to SSR 96-2p if it is consistent with the record.  This ruling, like all Social Security rulings, are binding on the Commissioner and Social Security Administration, and are to be relied on as precedent unless they are superceded or otherwise modified by later laws, court decisions, or rulings.  20 C.F.R. §402.35.  *See Prince*, 933 F.2d at 602.  The ALJ did not attempt to provide specific reasons for favoring the non-treating doctor over the doctors that actually saw Waters over an extended period of time. (More on this in a moment.)  In addition, the ALJ demonstrated a degree of circular logic by first finding the Plaintiff's testimony lacked credibility, but then discounting the treating sources' evidence for being inconsistent with Plaintiff's (supposedly non-credible) testimony.

  The ALJ must provide a better rationale as to why Plaintiff's testimony is not credible in light of the record.  The ALJ's brief statement in his decision is not specific enough to "build a logical bridge" to his credibility conclusion.  *See Schmidt*, 395 F.3d at 744.  Furthermore, the ALJ's conclusory statement makes it impossible to determine what evidence he relied on and if he even considered the evidence favoring Waters.  Although Waters may still be able to perform

12

his past work, the ALJ must adequately discuss and specify the reasons for his finding with proper evidence in the record.  Therefore, the case must be remanded.

**B.      Weight Given to the Treating Physician**

According to SSR 96-2p, if a treating source's medical opinion as to the nature and severity of an individual's impairments is consistent with the record and well supported, it must be given controlling weight.  SSR 96-2p.  However, an ALJ does not need to give controlling weight to a treating physician's opinion if it is not supported by objective medical findings. *Henderson v. Apfel*, 179 F. 3d 507, 514 (7th Cir. 1999).  If the ALJ ultimately denies disability, the regulations require the ALJ's decision to contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the record and must make clear to any reviewers the weight given to the treating source.  20 C.F.R. § 404.1527(d).  That decision is guided by six criteria:  the specialization of the physician, the consistency of the opinion with the whole record, the persuasiveness of the opinion, whether the opinion takes into account all of the evidence in the record, whether the opinion is supported by the medical signs and laboratory findings, and the nature and extent of the treating relationship.  *Id.; see also Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999).

Dr. Mitra was Waters' treating cardiologist.  The ALJ disregarded what he had to say pretty much out of hand:

> Dr. Mitra opined the claimant continued to be significantly disabled because of the combination of his coronary artery disease and obesity.  Dr. Mitra also noted the claimant had a severe limp and he could not perform any significant activity, however, the remainder of his ten point review of systems was normal.  The undersigned gives little weight to Dr. Mitra's opinion because the determination or decision of disability is an administrative finding that is expressly reserved to the Commissioner.  Additionally, Dr. Mitra's opinions on

13

>           the claimant's functional limitations are not consistent with the
>           claimant's testimony, and thus, the undersigned finds that Dr. Mitra's
>           opinion is not entirely reliable.

(R. 17).

It appears that the ALJ's main motivation in discrediting the treating source was the inconsistency between his findings and the Plaintiff's testimony.  As stated previously, this basis for determination is undermined by the fact that the ALJ earlier found Plaintiff's testimony incredible.  It is not out of the question that a Plaintiff's testimony and his treating physician's records be so wildly inconsistent that they both come off as implausible.  But if that is the case, the ALJ must say so specifically and explain why.  *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)(remanding back to ALJ because he did not adequately explain why he rejected the treating source's opinion).  In this case, I cannot see any glaring inconsistencies and the ALJ has not pointed out any.  Furthermore, the decision does not discuss many of the notes and medical records of Dr. Mitra that are entirely *consistent* with Waters' testimony, with Dr. Houck's notes and with the ALJ's findings.  An ALJ cannot "select and discuss only that evidence that favors his ultimate conclusion." *Clifford*, 227 F.3d at 871 (citation omitted).

Aside from the supposed inconsistency, the only other reason given for disregarding Dr. Mitra's testimony was that he attempted to categorize Waters as "disabled" and that is a determination left for the ALJ.  It is true that Dr. Mitra wrote in his progress notes that Waters "continued to be significantly disabled."  (R. 159).  But it seems obvious from the tenor of the notes that Dr. Mitra was merely summarizing his views on the overall state of Waters' health – that it was not real good.  It was plainly not an effort to supplant the role of the ALJ.  In any event, just because the ALJ can disregard a treating source's ultimate conclusion as to Plaintiff's

14

legal categorization, does not entitle him to ignore the rest of his findings.  In addition, SSR 96-5p states that "[a]djudicators must always carefully consider medical source opinions about any issue, including issues that are reserved to the Commissioner."

While he provided little justification for discrediting the treating source, the ALJ did attempt to show why he found the other sources persuasive.  Even then, however, the ALJ highlighted some instances where his own findings diverged from the non-treating sources'.  For instance, the state reviewers found that Plaintiff could stand for six hours, but the ALJ stated that it "gives the state agency conclusions significant weight, but finds that the claimant cannot stand for more than two hours in an eight hour day secondary to his morbid obesity and other significant medical impairments, including foot numbness and dysonea on exertion."  (R. 18.)  In addition, the ALJ ultimately concluded that Plaintiff did suffer from exertional limitations such as the inability to carry 20 pounds or to frequently climb stairs, but also said that he "gives the consultative examiner's opinion substantial weight, although it is noted that there were no specific exertional limitations."  (R. 18.)  The ALJ also neglected to mention that the consultative examiner, Dr. Kennedy, was potentially inconsistent in his findings when he states "there is a lack of pinprick sensation from the ankles down in both feet" but ultimately concludes Plaintiff has "full use of his bilateral lower extremities for operating foot controls."  (R. 123-24.)

These noticeable weaknesses in the non-treating sources opinions may be overcome both by what the ALJ finds credible in them and what he finds not credible in the treating sources' opinions.  Without an explanation as to why he did not give weight to Dr. Mitra's opinion, however, I cannot say whether the ALJ's decision was supported by substantial evidence. As

was the case with Plaintiff's credibility assessment, the ALJ must build a logical bridge in his decision that shows why he did not give the treating source evidence controlling weight. Consequently, this issue must also be addressed on remand.

**C.    No Medically Determinable Mental Impairment**

Waters next claims that the ALJ improperly rejected his claim of a mental impairment due to depression. In that regard, the ALJ stated that:

> Although the claimant testified that he probably had depression, there is no objective medical evidence to support this diagnosis, and the claimant's restrictions and limitations appear to be secondary to his physical impairment. Thus, the undersigned does not find that the claimant has a medically determinable mental impairment.

(R. 16.)

The ALJ's determination was not an error of law. Waters did not meet his burden of proving a medically determinable mental impairment in accordance with 20 C.F.R. § 404.1508. Not only was there no objective medical evidence, but Waters never sought mental health treatment, did not take any medication for depression, was never hospitalized for depression, was not referred to a mental health professional and no physician identified any mental limitations stemming from Plaintiff's complaint of depression. The ALJ's determination in that regard is supported by substantial evidence.

**D.    Waters Ability to Perform Past Work**

When determining whether a claimant has the Residual Functional Capacity (RFC) to return to past work, the ALJ must consider "the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of his or her [past relevant work]…." SSR 82-62, at *2. The ALJ must fully develop and explain any decision finding the claimant capable

16

of past work. *Id.* at *3.  In addition, the ALJ must question the VE about every impairment and restriction supported by the medical evidence during a Step 4 analysis.  *See Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003);  *Rodriguez v. Barnhart*, 2002 WL 31155056, at *11 (N.D. Ill. Sept. 27, 2002).   In his decision, the ALJ stated:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it [IT manager] as actually and generally performed.  The claimant can perform a significant range of skilled sedentary work.  The vocational expert testified that an individual with the claimant's residual functional capacity as determined, and the claimant's vocational factors, could return to work as an IT manager.

(R. 18.)

Since it is possible that the hypothetical posed to the VE did not include all of the impairments, symptoms and restrictions supported by the record as a whole, the ALJ's finding that Waters can perform his past relevant work must be remanded in light of the unsupported credibility decision and weight given to Waters treating physicians.  The accepted sedentary RFC the ALJ presented to the VE in his hypothetical did not include Waters' need for rest breaks after sitting for a period of time, as was suggested by Waters in his testimony.  The VE did testify that if all of Waters' testimony was found credible or if Waters could not sit more than half an hour without taking a break, there would be no jobs that he could perform.  (R. 233.)  The hypothetical also did not suggest that Waters' feet are always numb, and he has occasional hip pain and problems using his lower extremities for foot controls, scenarios supported by the findings made by the ALJ.

Since this Court is remanding on the credibility determination, it must also remand on Plaintiff's ability to perform his past work.

17

### III.  CONCLUSION

The ALJ's opinion does not include essential findings and support from the record, which have been highlighted by this Court's Order.  This case is **REMANDED** to the administrative agency for further proceedings consistent with this Order.

**SO ORDERED.**

ENTERED:  March 13, 2008

                                              s/ Philip P. Simon
                                              PHILIP P. SIMON, JUDGE
                                              UNITED STATES DISTRICT COURT